ELIZA BESEMAN v. THE PENNSYLVANIA RAILROAD COMPANY.

A railroad company is not responsible for the incidental damages occasioned to land abutting on or near to the track, the road being run, in all respects, with care and skill.

---

This suit is for damages alleged to have been done to the houses and lands of the plaintiff by the running of the defendant's trains.

The declaration, in substance, alleged that the plaintiff was the owner of certain lots of land in Jersey City, fronting on Fifth street, on each of which lots there were dwelling-houses on the front and rear, and that the defendant, on the 1st of January, 1874, built an elevated track for a railroad, running at the rear of said lots and very near, to wit, within ten feet, of the dwelling-houses situated on the rear part of said lots, and during, &c., has used said elevated track for the passage of locomotives and cars in the transportation of cattle, sheep, swine, manure and other freight, as to render said dwelling-houses of said plaintiff unfit for habitation, and of no use or value to said plaintiff whatever, and that said defendant, during all the time aforesaid, both in the day time and at all hours of the night time, has wrongfully allowed its cars, loaded with cattle, sheep, swine, manure and other freight, emitting noisome and unhealthy odors, to stand upon said track, within close proximity, to wit, the distance of ten feet,

to the dwelling-houses on the rear of said lots, and has then and there shifted and distributed its cars, and blown the whistle of its locomotives, and started its trains of cars, and suddenly stopped them and backed them and started them again, causing great and unusual noises in the neighborhood of said dwelling-houses, and causing divers noxious, offensive and unwholesome vapors, fumes, smokes, smells and stenches to flow, arise and surround said dwelling-houses, and thereby also jarring the doors and walls of said dwellings and breaking the plaster upon the walls, and by means aforesaid has driven the tenants from said houses, and has rendered the same untenantable and unfit for use, &c.

The first plea was the general issue, on which issue was joined.

The second plea, which was demurred to, was a special traverse.

In this the defendant set out its chartered right to build this elevated road, and then averred " that in execution of said powers, and by force and virtue of said acts, it did survey, lay out and locate said railroad on the several courses set down in said survey, and did construct a railroad between the points in the said last above act set forth, as it fully might do, doing no unnecessary damage to private or other property, &c.

That after the construction of said railroad at the several times when, &c., the defendant, in order to carry into effect the objects of the incorporation of said The United New Jersey Railroad and Canal Company, did use the same in the prosecution of its said business as a common carrier of passengers and freight, and continued the same during the time mentioned in said declaration, as it lawfully might do for the causes aforesaid, and did thereby necessarily create some smell and some noise, and did necessarily shift and distribute its cars, and did necessarily blow the whistles of its locomotives, and did necessarily start and suddenly stop with trains of cars and back them and start them again, and did necessarily cause noises, smoke and vibration, and did necessarily transport

thereon cattle, sheep, swine, manure and other freight, as it lawfully might do for the causes aforesaid, which are the supposed grievances of which the plaintiff in her said declaration complains, without that, that it, the said defendant, was guilty of the said supposed grievances, or any or either of them, and this it, the said defendant, is ready to verify.

Argued at June Term, 1887, before BEASLEY, CHIEF JUSTICE, and Justices SCUDDER, DIXON and REED.

For the plaintiff, *William H. Davis* and *John Linn.*

For the defendant, *James B. Vredenburgh.*

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE. The form of the plea which has been demurred to will be considered briefly in the sequel, but for the present it will be taken to present, in a sufficient manner, the facts on which the defendant, in this part of the procedure, has based its defence. That defence, stripped of all verbosity, is that by force of its franchises derived from the public grant it has built its road and run its trains, carrying merchandise and freight, near to the lands of the plaintiff, doing the plaintiff no more damage than that which necessarily results from the transaction of such acts and business. Its position is that for such incidental and unavoidable damage it is not responsible. The plaintiff occupies the opposite ground, claiming that with respect to private property a railroad is, *per se,* a nuisance whenever it throws a detriment such as would be actionable at common law on such property.

That this proposition, on which the plaintiff's case rests, is a most momentous one is at once apparent. If it should be sustained, an illimitable field of litigation would be opened. If a railroad, by the necessary concomitants of its use, is an actionable nuisance with respect to the plaintiff's property, so it must be as to all other property in its vicinity. It is not

only those who are greatly damnified by the illegal act of another to whom the law gives redress, but its vindication extends to every person who is damnified at all—unless, indeed, the loss sustained be so small as to be unnoticeable by force of the maxim, "*De minimis non curat lex.*" The noises and other disturbances necessarily attendant on the operation of these vast instruments of commerce are wide spreading, impairing in a sensible degree, some of the usual conditions upon which depend the full enjoyment of property in their neighborhood; and consequently, if these companies are to be regarded purely as private corporations, it inevitably results that they must be responsible to each person whose possessions are thus molested. Such a doctrine would make these companies, touching such land-owners, general tort-feasors; their tracks run for miles through the cities of the state, and every land-owner on each side of the track would be entitled to his action; and so in the less populated districts, each proprietor of lands adjacent to the road would have a similar right, and thus the litigants would be numbered by thousands. It is questionable whether the running of railroads would be practicable if subjected to such a responsibility.

Nor is this susceptibility to be sued on all sides the only or even the worst consequence of the theory in question. For if these rights of action exist, it follows, necessarily, that each of the persons in whom they are vested can prevent the continuance of the wrong out of which such rights of action arise. If this plaintiff should recover two or three verdicts against the defendant because of the damage that is inseparable from the running of its trains, there is plainly no ground on which the Chancellor could refuse to enjoin a continuance of the nuisance. Nor does there appear to be any relief from such a consequence; the aggrieved land-owner would be the master of the situation, for there is no law by force of which the company could take his land *in invitum*, or compel him to have his damages assessed once for all. In short, the plaintiff's claim involves the assertion that he can put a stop to the business of the defendant at the point in question.

The statement of the legal situation, if the hypothesis in question obtained, shows that such hypothesis is a mere vagary. From the first institution of railroads in this state to the present time, these grounds of action, if they exist, have been present in numberless instances, and yet this is the first suit of the kind that has been brought. The statutes of the state have always been, and are now, framed on the opposite theory. Those laws, in providing for the acquisition and condemnation of lands, authorize the taking of such lands only as are requisite for the necessary structures of the road and the accommodation of its business, and require the payment of damages only to that class of land-owners. These corporations are not permitted to sequester any other property, nor to compensate for other damages. The central idea of the system is that for incidental damages these companies are not responsible. This system, thus ancient and uniform, is now challenged in this case.

The process of reasoning which is used in support of the plaintiff's claim has not been overlooked. It is said that the plaintiff's property has been damnified, and that as the law declares that whenever there is a wrong there is a remedy, the legislature itself cannot deprive him of his right to redress. But this course of argument contains in it the fallacy that the general rules of law are universal, like rules of logic. But law is a practical science, and almost all its general principles, however wide their application may seem to be, have, on all sides, their reasonable limitations. Ingenuity is ever apt to run them to extremes, and it was this too subtle— *"nimis callida"*—interpretation of legal rules that led Cicero to the declaration, *"Summum jus, summa injuria."* Therefore, if the maxim asserting the universality of the redress provided by the law for wrongs would, by its terms, extend to the damage sustained by the plaintiff, in its practical application, it would be kept within expedient bounds. But in truth, to take this maxim as the rule in the present case is to assume its fundamental term—that is, to presuppose that a wrong was committed by the mere act of running these trains.

This is the very point in controversy, for the defence is that the legislature could dispense the company from responsibility for such damage, and that it has done so.

This latter contention must, I think, be sustained. The legislative power is amply competent for such a purpose, and it is obvious that it has put forth such power. It is a radical error to regard these corporations as simply private. They have a public as well as a private aspect, and it is on this account that the immunity in question belongs to them. That they possess, in some degree, the nature of a public corporation cannot, and will not, be denied, for they could not otherwise acquire a foot of land for their roadway in this state by condemnation. The constitution prohibits the taking of private property for any other than a public purpose, so that the concession that a railroad company can compel the surrender of the land necessary for its purpose is an admission that such purpose is a public one, and the running of trains is as much a part of such purpose as the laying of the road bed is. It would seem quite irrational to say that the making of the track is an act done so far in behalf of the community that the eminent domesne of the state may be resorted to for its furtherance; but that the running of trains upon such track is a purely private affair, in which the people at large have no interest. These roads, in view of their effect upon social and commercial interests, are of vastly more importance than are most of the public highways, and it is on account of this transcendent usefulness that they, to a large extent, have been and must be regarded as public agencies.

Looking at them in this light, it is but following the ordinary path to declare that they are not responsible for those incidental damages that result from the proper exercise of their functions. This is the settled rule. The legislature may authorize the altering the grade of a city street; such act may occasion immense loss to the owners of the abutting property, and such loss is *damnum absque injuria*, the reason being that the improvement is a matter of public concern, and that each individual member of the community, while he is

entitled to its benefits, must submit to its burthens.   The attitude of a railroad company, so far as relates to the applicability of legal principles, is not dissimilar.   They run their trains by legislative authority for the public benefit, and on that account, in doing such acts, they are so far forth the representatives of the body of the people.   The defendant alleges that it has kept entirely within the limits of its chartered rights in running its trains, and that the plaintiff has suffered no damage except such as is necessarily incident to such transactions, and it seems to me that if this be true this action cannot be maintained.

In support of the contrary view, the counsel of the plaintiff relies on two cases, viz.: *Pennsylvania R. R. Co.* v. *Angel*, 14 *Stew. Eq.* 316, and *B. & P. R. R. Co.* v. *Fifth Baptist Church*, 108 *U. S.* 328.   Neither of these decisions is in point, and the principles of law declared in the latter is directly adverse to the proposition laid as the basis of this suit.   The former of these precedents presented to the court the naked proposition whether the railroad company, the defendant in the proceeding, should be restrained from doing certain acts which were obviously *ultra vires*.   The court found as a fact that the defendant was doing continuously, to the detriment of the complainant, that which was entirely unauthorized by its charter; and the case did not call for any expression of opinion on the part of the tribunal as to the effect of incidental damage done by the road in the necessary operations of its business.   The case has no value as a precedent beyond this.

The decision of the Supreme Court of the United States just referred to rested on the same basis.   A railroad company had located its repair shop and engine-house next to a church, to which it was a nuisance by reason of the noises occasioned by the business carried on at the place.   The court declared that the company could not justify the maintenance of such a nuisance.   The propriety of this result seems unquestionable.   The railroad company, in selecting a place for repair shops, acted altogether in its private capacity.   Such

location was a matter of indifference to the public, and consequently, with respect to such an act, the corporation stood on the footing of an individual and was entitled to no superior immunities. But in this same case Mr. Justice Field, in his opinion, is careful to emphasize the difference in legal results between those damages which are the necessary product of the running of a railroad and those which are not of that character, for he says: "Undoubtedly a railway over the public highways of the district, including the streets of the city of Washington, may be authorized by congress, and when used with reasonable care it produces only that incidental inconvenience which unavoidably follows the additional occupation of the streets by its cars with the noises and disturbances necessarily attending their use, no one can complain that he is incommoded. Whatever consequential annoyance may necessarily follow from the running of cars on the road with reasonable care is *damnum absque injuria*. The private inconvenience in such case must be suffered for the public accommodation."

It is apparent that the inconveniences and annoyances here mentioned were such results from the running of the cars in the public streets that would have been deemed actionable wrongs but for the public character of the business of which they were the necessary incidents. It is stated to be a damage (*damnum*), but it is *absque injuria*, because the cause producing it is legalized, in promotion of the general welfare.

The decisions appear mainly to agree with respect to this doctrine. They are quite numerous, and the few following are cited merely as examples: *Radcliff's Executors* v. *Mayor, &c., of Brooklyn*, 4 *Comst.* 195 ; *Chapman* v. *Albany and Schenectady R. R. Co.*, 10 *Barb.* 360 ; *Grand Rapids and Ind. R. R. Co.* v. *Heisel*, 38 *Mich.* 62 ; *Struthers* v. *Dunkirk*, 87 *Penna.* 282 ; *Coby* v. *Owenboro R. R. Co.*, 10 *Bush* 288 ; *Pennsylvania R. R. Co.* v. *Lippincott*, 19 *W. N. C.* (*Pa.*) 513.

Nor does it seem that this principle is, on the whole, unjust in its operation. It is, in all probability, no more

reasonable to say that the property in the vicinity of a railroad will be greatly reduced in value by the running of its cars than that the introduction of stores into a city street before exclusively devoted to dwelling-houses impairs the value of the property devoted to such use, the fact being that while each of such lots becomes depreciated for one particular use, its general value is much enhanced. And such is the effect of railroads on contiguous property, for while such land may be said to be injured on one side it is benefited on another, and there is no great hardship in requiring the land-owner to submit to a loss for which he receives a compensation.

There is but a single case in this state in which the present question has been placed directly *sub judice*. In *Morris and Essex R. R. Co.* v. *City of Newark*, 2 *Stockt.* 352, the owners of the land abutting on the street along which the railroad company had laid a track, complained that their property was incidentally injured by the running of the trains, but this was treated as *damnum absque injuria*, this being the language of the Chancellor, viz.: "It follows further, admitting the correctness of the views expressed, that the adjacent land-owner cannot maintain an action at law for consequential damages unless he can show a negligent exercise by the company of their legal rights, because no action at law will lie for a consequential injury necessarily resulting from the exercise of a legal right under legislative authority." And some of the New York decisions already cited were referred to in corroboration of the view thus declared.

And this for at least the third of a century has been the practical construction given by the courts of this state to the charters of these corporations. It has been the invariable course, so far as is known, for juries to be instructed that these companies are not responsible for the results of the running of their trains, provided due care and skill be observed in the business. It has been of frequent occurrence that valuable tracts of woodland have been fired from the locomotives drawing trains, and on such occasions the judicial instruction has uniformly been that the damages so occasioned

could not be made the ground of suit, unless the spark-arresters were out of order or were not of approved pattern, or negligence of some kind had been exhibited. And it is not remembered that such doctrine has been called in question, even to the extent of being challenged, in the argument of counsel.

And it was upon this principle that the cases of *Hoff* v. *West Jersey R. R. Co.*, 16 *Vroom* 201, and *Salmon* v. *Del., L. & W. R. R. Co.*, 10 *Vroom* 299 ; 9 *Vroom* 5, were severally decided.

In England the same doctrine has prevailed. The distinction between the damage done by sparks escaping from a locomotive run by a company unauthorized by charter, and when such results proceed similarly from an engine run under a legislative sanction, is sharply drawn in the case of *Jones* v. *Festiniog R. R. Co.*, L. R., 3 Q. B. 733, it being held that while a liability to suit arose in the former case, in the latter that it did not.

It may be further remarked that this principle had become so prevalent and deeply rooted in the jurisprudence of this country that it has required express legislation in some of the states to eradicate and supersede it. *Grissell* v. *Housatonic R. R. Co.*, 26 *Law Reg.* 260 ; *Lyman* v. *Boston and W. R. R. Co.*, 4 *Cush.* 288. And it is not uninstructive to note that when that legislation was being tested before the courts, the contest was with respect to its constitutionality, which was assailed on the ground that the legislature could not deprive these corporations of that irresponsibility for consequential damages that had been impliedly given to them in their charters. In the judicial opinion relating to such controversy it is taken as an admitted *datum* that the corporate bodies were originally possessed of the immunity claimed, but that it was competent for law-makers to deprive them of it.

Nor have I found any serious constitutional difficulty with respect to this question. It has not been unobserved that it is said that as the legislature cannot authorize, by force of the constitution of the state, property to be taken for public use

without compensation, it follows that it cannot legalize an injury to such property. The argument is that to injure property for the public benefit to the extent say, of one-half of its value, is, in substance, to take for that purpose a moiety of it.

But this line of reasoning excludes altogether, as it appears to me, the legislative control over the subject. As already remarked, if the right of action cannot be taken from the land-owner when the injury to his property is equal to one-half of its value, neither can this be done when it is damaged to one-twentieth part of its value, or in any other actionable degree. To hold otherwise would be not only illogical but also impracticable, for who would be able to say to what degree the damage must go in order to give the right of action? In my opinion the legislative power covers the entire field of incidental injuries. In the case cited from the English reports it was held that the burning of a hay-stack by the engine of an unchartered company was a loss that could be redressed by action, without respect to the question whether the fire had been kept with proper care or not; and yet the court declared, as has always been judicially declared in this state, that if such engine had been used under legislative authority such loss would have been remediless. This, it is evident, was maintaining a legislative right to deprive a person of a right of action due to him at common law for an injury resulting in the entire destruction of his property, and this is the legal principle that has practically been enforced in this state from the time of the existence of its first railroad up to the present hour. And it is this entire doctrine that must be abrogated if we say that by force of the constitution the legislature cannot exempt these companies from responsibility for those things that are the necessary concomitants of the use of the road. When property has been incidentally injured, no matter to what extent, as an unavoidable result of a public improvement, such loss has always been deemed remediless, and it has never been supposed that the property so injured was taken, in the constitutional sense, for the public use. All

the public improvements in the state have been built and are now resting on this foundation. For my part, therefore, I find no embarrassment in disposing of the present subject, for I have put railroads in the category of public agents, and have regarded them as possessed of all the immunities, in the particular in question, belonging to such an office ; for to me it does not appear to be consistent with reason to declare that these exemptions may be legislatively bestowed upon an inconsiderable turnpike company but cannot be given in favor of these great highways connecting distant countries and extending over a continent.

It remains to say but a word about the form of the plea. It seems to me unobjectionable. Its inducement contains the facts essential to the defence arising out of the principles just declared. It sets out the franchise to run the road and alleges care and skill, and that no unnecessary damage was done. If any avoidable damage was done, the proper course is for the plaintiff to tender an issue upon that matter in his replication. This is the usual course.

I think the demurrer should be overruled.

Justice DIXON dissents.