28 N.J. Super. 355 (1953)
100 A.2d 708
KIDDE MANUFACTURING COMPANY, INC., A CORPORATION OF NEW JERSEY, PLAINTIFF,
v.
TOWN OF BLOOMFIELD IN THE COUNTY OF ESSEX, A MUNICIPAL CORPORATION OF NEW JERSEY, AND BOROUGH OF GLEN RIDGE IN THE COUNTY OF ESSEX, A MUNICIPAL CORPORATION OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided November 16, 1953.
As Modified by Order of October 19, 1954.
*356 Mr. Samuel D. Williams (Mr. Jerome C. Eisenberg, appearing), attorney for plaintiff.
Mr. Thomas J. Markey, attorney for defendant Town of Bloomfield.
Messrs. Stryker, Tams & Horner (Mr. Burtis S. Horner, appearing), attorneys for defendant Borough of Glen Ridge.
COLIE, J.S.C.
This action is brought by Kidde Manufacturing Company, Inc. against the Town of Bloomfield and the Borough of Glen Ridge, seeking damages for injury to its property caused by the negligence of the defendants in making improvements to a natural water course known as Toneys Brook. More specifically, it is charged that the improvements made by Glen Ridge upstream from the plaintiff's property increased the velocity of flow, eroded the stream bed and undermined the walls along the brook adjacent to the plaintiff's property and damaged a nearby building. The charge of negligence against Bloomfield is that its subsequent improvements downstream from the plaintiff's property further accelerated the flow and damaged plaintiff's property. Negligence is alleged in that each failed to take proper measures, in accordance with standard accepted engineering practice, to protect the plaintiff's property from the injurious consequences that would naturally follow from their respective improvements.
As to Glen Ridge, there is a further charge of negligence arising out of an alleged diversion of drainage from a 38-acre tract into Toneys Brook at a point upstream from plaintiff's property which further accelerated the velocity. There is no proof to support this allegation and it will not be discussed.
*357 Toneys Brook rises in Montclair and flows in a general southerly direction through Glen Ridge and Bloomfield where it empties into Second River. The topography of the watershed of Toneys Brook is such that the brook has, for many years, been sensitive to flooding at times of heavy or sudden precipitation. This has been true since at least 1928 when there was litigation between Consolidated Safety Pin Company, a predecessor in title of plaintiff, and the Town of Montclair. See Consolidated Safety Pin Co. v. Montclair, 102 N.J. Eq. 128, affirmed O.B. 103 N.J. Eq. 378 (E. & A. 1928). The Consolidated Safety Pin Company property is the property now occupied by the plaintiff. The plaintiff's property lies on both sides of Toneys Brook with the main buildings on the east side, and on that side has a frontage along the brook of approximately 400 feet, the northerly or upstream end being approximately 135 feet downstream from the center line of Clark Street bridge. For years past the area near the Clark Street bridge in Glen Ridge was, from the point of view of floods, a critical area. To alleviate this condition the County of Essex, which maintains the Clark Street bridge across the brook, in 1922 raised the bridge about 13 inches, but this did not cure the situation. In consultation with the engineers of the State Water Policy Commission and of the County of Essex, a survey of the stream was made by the E.R.A. in 1934-5. Thereafter, Glen Ridge constructed 2,348 feet of rubble masonry walls and reconstructed 1,242 feet of rubble masonry walls on both sides of the brook, from the bridge to the Matchless Metal Polish Company plant some 440 feet upstream from the center line of Clark Street bridge. Subsequently it paved the stream bed from the Matchless Metal Polish Company bridge to a point 75 feet below the center line of the Clark Street bridge, a total in linear feet of 510. The paving operation required a lowering of the existing stream bed an average of about 18 inches and the laying of a six-inch smooth finish reinforced concrete flooring or bottom. The combined effect was to reduce the effective width to 20 feet, whereas the effective width had averaged more before the *358 work because of differences in width and because of some stretches of sloping banks which provided a wider channel in times of high water.
The purpose of walling and paving the stream was to expedite the flow past the Clark Street bridge sufficiently fast to avoid its backing up and overflowing the banks. The New Jersey State E.R.A. plan discloses that the proposed slope was to follow generally the slope of the stream at the time that the E.R.A. survey was made and it contemplated the lowering of the stream bed commencing at the Matchless Metal Polish bridge from as little as a foot and as much as two feet, and that the proposed slope was to be carried downstream some 600 or more feet to the point where the Delaware & Lackawanna Railroad trestle crosses Toneys Brook, and contemplated 50 linear feet of rip-rap immediately downstream from the Clark Street bridge. All engineers testified that the paving of the brook with a six-inch reinforced concrete flooring would reduce the friction and accelerate the flow. In 1937 the State Water Policy Commission advised Glen Ridge that "paving of the channel through Clark Street will undoubtedly transfer the trouble at Clark Street to the downstream end of the paving." The success or failure of the improvements in relieving floods seems to have been in a considerable degree dependent upon the point where a "hydraulic jump" was formed. A hydraulic jump is a place where the surface water is highest, i.e., a point of greatest depth. One effect of a hydraulic jump is to lessen the velocity of flow and consequently the determination of its location was important. If too close to the Clark Street bridge, a control point or critical area, the jump would tend to slow the flow and create a backwater, and to the extent of the backwater nullify the accelerated run-off which the improvements sought. The State Water Policy Commission warned of this. It wrote:
"Because of the variable sections of channel below this point [Clark Street bridge], it is not practical to compute the location of this jump. We believe that if the paving is carried 100 feet below the outlet of Clark Street bridge, the jump will be formed *359 sufficiently below the bridge so as not to interfere with the low stage flow through this opening."
The Commission also warned that
"Paving of the Channel through Clark Street will undoubtedly transfer the trouble at Clark Street to the downstream end of the paving."
At about the same time Mr. Howard J. Finley, Engineer of Designs for Essex County, made a report with reference to the proposed schemes for alleviation of the critical condition at Clark Street, and noted that fieldstone paving, or rip-rap, was to extend 50 feet below Clark Street bridge. He also called attention to other matters as follows:
"For this plan the deepening will meet the present bed of stream 650 feet below the bridge. Walls for this distance will probably need underpinning."
This report came to the knowledge of Glen Ridge. The work which Glen Ridge did was substantially that outlined in Scheme B of Mr. Finley's report of September 19, 1937, with certain modifications. The 50 feet of rip-rap immediately downstream from the Clark Street bridge was omitted, and instead of deepening the present bed of the stream for 650 feet below the Clark Street bridge, Glen Ridge, in 1939 and 1940, paved 75 feet below Clark Street bridge and deepened the stream for 140 feet. It did not underpin walls for 650 feet below Clark Street bridge. The stream bed was not lowered as much as indicated on the E.R.A. profile because of the existence of a main found to exist across the stream and near the Clark Street bridge, a minor and unimportant deviation.
In 1937-1938 Bloomfield, from the railroad culvert to Glenwood Avenue, constructed 2,362 linear feet of rubble masonry walls, and in 1946 laid 1,180 linear feet of reinforced concrete paving to give an effective stream width of 20 feet. From the downstream end of the Glen Ridge improvements to the upstream end of the Bloomfield improvements there is a stretch of some 500 feet in which the stream bed was *360 not stabilized by the installation of a six-inch reinforced concrete flooring, but remained with a gravel and silt bottom.
At a point some 240 feet below the center line of Clark Street bridge there exists and has existed for many years a constriction in the channel 15 feet wide, and below that constriction and approximately opposite the downstream end of a three-story building on the plaintiff's property the Consolidated Safety Pin Company in 1913 constructed a dam across the stream for the purpose of water storage. As originally constructed this dam consisted of concrete abutments on each bank and a 16-foot gate, the full width of the brook, which could be raised in floods to permit the water to pass without backing up and flooding upstream. The gate seated against a wooden stop placed on a concrete sill three feet wide. This was unsatisfactory because the gate could not be raised quickly enough in flash floods to prevent the backing up of water, and consequently Consolidated Safety Pin Company, at some date after 1913, widened the stream eight feet on each side of the dam and installed wing gates which were hinged so that they could be immediately dropped in the event of a sudden rise in the stream and permit an unimpeded flow. This dam was in the stream until 1942, when the abutments were cut to the then existing level of the bed of the stream. A curved wall on the west bank at the time was leveled to the then stream bed and a tree standing back of the curved wall was removed and some 30 to 40 tons of rocks were removed from the stream bed upstream from the site of the dam. The dam stabilized the brook upstream of the dam and retarded the velocity of flow. The profile of the stream bed in 1934-5, 1942, and 1952 is enlightening. From 1935 to 1942, between the site of the dam and the Bloomfield-Glen Ridge line, the stream bed dropped in round figures, about one foot; between 1842 and 1952 it dropped about two feet. At or about the 15-foot constriction in the stream near the north end of plaintiff's property the drop from 1935 to 1942 was about one foot; from 1942 to 1952 approximately two feet. Immediately upstream from the site of the 1913 dam, removed in 1942, the drop in the *361 level of the stream bed between 1934-35 and 1952 was just under two feet.
In 1943-44 no part of the dam, or that part of it which remained, was visible in the stream, and in 1949 the dam, or so much of the abutments as remained, were exposed to view.
There is no substantial dispute as to the drop in the stream bed between the years 1934-35 and 1952. The dispute arises as to the cause of this erosion, degradation or desilting. The plaintiff points out that the erosion of the stream bed approximately doubled in the period from 1942 to 1952 over the amount of erosion from 1934 to 1942.
Turning now to the work which Bloomfield did in the brook, the court finds that between 1937 and 1946 it walled and paved the brook from Glenwood Avenue to the railroad culvert; that near Glenwood Avenue it lowered the stream bed almost three feet by the removal of silt and lowered the stream bed just below the railroad culvert by six-tenths of a foot when they found a concrete slab beneath the culvert. Between 1944 and 1948 Bloomfield cleaned out about 1,600 cubic yards of debris or silt which had accumulated in the stream. It is conceded that this was in accordance with good engineering practice.
The purpose of walling and paving the brook to a width of 20 feet was to expedite the flow off and alleviate flood conditions. Bloomfield's flood condition problems were acute at Glenwood Avenue, and its motive was to get the water of Toneys Brook into Second River as fast as it could.
The plaintiff does not challenge the statutory right of either of the defendant municipalities to make improvements in the brook, nor does it allege that the workmanship of either Glen Ridge or Bloomfield in the walling or paving of the brook was faulty. The plaintiff seeks to establish that as against Glen Ridge it, in the exercise of reasonable care, should have foreseen that when it walled and paved the brook to a point 75 feet below the center line of Clark Street bridge and there stopped its work it would scour the stream bed in its unpaved condition and undermine the walls on *362 the east side of the brook, and that in the exercise of reasonable care it should have taken precautions to guard against that eventuality. As to Bloomfield, the plaintiff's claim is based upon Bloomfield's negligence in stopping its improvement at the railroad culvert, thereby leaving several hundreds of feet of the stream unpaved and subject to erosion and lowering as a result of the increase in velocity opposite the plaintiff's property, resulting from the combined improvements of Glen Ridge above and Bloomfield below.
The municipalities offered proof that the plaintiff's walls were improperly constructed because they were not deep enough to rest upon a solid foundation. This argument is not persuasive because the walls had stood the ravages of the brook with no apparent damage from their erection until 1948. So far as the proofs show, there was no appreciable damage or erosion until the stream bed had been scoured out and water had undermined the walls. So we are brought back to the crucial question of what caused the desilting opposite the plaintiff's property. The court finds that the Glen Ridge improvements, completed in 1940, shifted the critical point from Clark Street downstream to a point near the footbridge at the north end of plaintiff's property, that the velocity was materially increased at the point where the reinforced concrete paving ended, and that while the 15-foot constriction and the hydraulic jump had an appreciable effect in cutting down the velocity, nevertheless the head of water that built up in times of high water or flood conditions created a pressure which speeded the flow through the 15-foot constriction. Glen Ridge had foreknowledge that the walls below might need underpinning and it did underpin some walls but did nothing to the walls of the plaintiff. As to Bloomfield, its improvements quickened the run-off. Before those improvements Glenwood Avenue was a control point because of the constricted channel. When that constriction was removed, some 1,600 cubic yards of silt and debris removed, the brook walled from the railroad culvert to Glenwood Avenue, the velocity of run-off increased, back waters were eliminated and consequently the flow upstream *363 of Bloomfield's improvements and opposite the plaintiff's property was accelerated. That this would happen should have been obvious, for when any part of an alluvial stream, such as Toneys Brook is altered, changes inevitably follow elsewhere, either for good or bad.
Defendants urge that they were entitled to judgment, relying upon Bowlsby v. Speer, 31 N.J.L. 351 (Sup. Ct. 1865), holding that no right exists arising out of the retention, diversion, repulsion or altered transmission of surface water. This rule has over the years been whittled away, and wisely so. They also rely upon Beseman v. Pennsylvania R.R. Co., 50 N.J.L. 235, affirmed 52 N.J.L. 221 (E. & A. 1889), arguing that since the plaintiff's injuries, if any, were incidental to acts done under legislative authority, such injuries are damnum absque injuria. The Beseman case is authority for the proposition that there is no legal responsibility for incidental damages that result from the proper exercise of their functions under legislative authority. The crucial words are "the proper exercise of their functions," and there is no blanket absolution of these defendants from the consequences that flow from negligent actions. Defendants further argue that there has been no proof of active wrongdoing and under the well-settled rule in this state, there is no liability upon a municipality for mere nonfeasance. The complete answer to this argument is to be found in Milstrey v. Hackensack, 6 N.J. 400 (1951). At page 407 the Supreme Court quoted from Salmond on Torts, sec. 70, as follows:
"Once establish that the local authority did something to the road, and the case is removed from the category of nonfeasance. If the work was imperfect and incomplete it becomes a case of misfeasance and not nonfeasance, although damage was caused by an omission to do something that ought to have been done. The omission to take precautions to do something that ought to have been done to finish the work is precisely the same thing in its legal consequence as the commission of something that ought not to have been done, and there is no similarity in point of law between such a case and a case where the local authority have chosen to do nothing at all." *364 Milstrey v. Hackensack, supra, has gone a long way in clarifying the confused state of the law as to the meaning of active wrongdoing, and brings within the meaning of the term "active wrongdoing" and "positive misfeasance" the failure to perform the work completely.
On the question of the contributory negligence of the plaintiff in removing the dam in 1942, it must be borne in mind that the Glen Ridge improvements were complete prior to the removal of the dam, and it also must be borne in mind that Bloomfield's improvements were then partially completed. Both municipalities were aware of the existence of the dam, were aware that it was a control point which, to a considerable degree, governed the velocity of the flow past the plaintiff's property. Neither Glen Ridge nor Bloomfield had any reason to believe that the dam was to be cut down to the 1942 stream bed level and so there enters into the case an affirmative act on the part of the plaintiff which, in the court's judgment, is controlling. The fact that the de-silting and lowering of the stream bed was, in round figures, double after 1942 what it had been from 1934 to 1942 is compelling evidence that the degradation and desilting which caused the undermining of the plaintiff's walls and the damage that resulted therefrom, was proximately due to a combination of three elements  the increase in velocity brought about by the Glen Ridge and Bloomfield improvements and the action of the plaintiff in removing the dam and some 30 or 40 tons of stones upstream from the site of the dam. So long as the remains of the dam stood it was a stabilizing element in the stream bed, and with its removal that element disappeared, and combined with the removal of the 30 or 40 tons of stone, was a contributing proximate cause to the cutting away of the stream bed and the results that followed. This action on the part of the plaintiff was negligent and, as stated above, a proximate contributing cause to the end result, and for that reason the plaintiff cannot recover in this action and judgment is entered for the defendants and against the plaintiff.