39 N.J. Super. 583 (1956)
121 A.2d 764
STATE OF NEW JERSEY, EX REL. BOARD OF COMMISSIONERS OF THE TOWNSHIP OF NORTH BERGEN, FUNCTIONING AS THE BOARD OF HEALTH THEREOF, AND TOWNSHIP OF NORTH BERGEN IN THE COUNTY OF HUDSON, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFFS,
v.
WOR-TV TOWER, ET AL., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided March 23, 1956.
*584 Mr. Nicholas S. Schloeder, for the plaintiffs.
Mr. Willard G. Woelper and Mr. William R. Vanderbilt for the defendants (Messrs. Toner, Crowley, Woelper & Vanderbilt, attorneys).
*585 STANTON, J.S.C.
This action is brought to have a television transmission tower known as WOR-TV North Bergen adjudged a public nuisance and abated by the removal of all or part of it.
The tower, which rises 760 feet above the ground and 1,000 feet above sea level, is situated on the Hudson River Palisades about two miles due west of Central Park, New York City. It was located there apparently to obtain a maximum television broadcasting radius in the New York metropolitan area. The construction work was commenced in the fall of 1948 and completed in late June 1949. The cost of the tower, exclusive of electronic equipment, was approximately $350,000. Broadcasting commenced in August 1949, and was discontinued in December 1953. Thereafter the station broadcast its programs from the Empire State Building in New York. Since that time a caretaker or watchman has been on duty during part of the daylight hours. The tower stands in a built-up residential neighborhood. Within a radius of three or four blocks the buildings are mostly one- and two-family houses with some multi-family apartment houses. There is a large public school about two blocks away, and in the very city block in which it is located there is a moving picture theatre with a seating capacity of about 1,000. It is in a block bounded by 72nd Street on the south, 73rd Street on the north, Palisade Avenue on the east and Bergenline Avenue on the west. The width of 72nd and 73rd Streets and Palisade Avenue is 50 feet. The distance between 72nd and 73rd Streets is 200 feet. The tower base is about 96 feet square and is about 50 feet west of Palisade Avenue. The tower is unguyed. In it there is a control house about 550 feet above the ground. On three sides of it the dwelling houses are approximately 100 feet from its base. In the environs in which it is set, it can be appreciated why this tower is regarded by some residents in the immediate vicinity as a monstrosity.
The plaintiffs contend that the tower is a nuisance per se because it is not constructed adequately to withstand hurricane *586 winds, and because ice and snow accumulate on it, and upon thawing fall beyond the property lines of the owner of the tower, with damage to adjoining property and risk of injury to people in the vicinity. It is contended also that there has been negligence in the maintenance of the tower in that warning lights upon it have been allowed to go out, causing it to become a menace to aerial navigation in foggy weather and at night, and in permitting fires to occur on the structure with damage in one case to property in the vicinity.
It would seem that this action, which was commenced on January 20, 1955, was instituted as a result of the psychological reaction of people in the neighborhood to the hurricane "Carol" (August 31, 1954) and the hurricane "Hazel" (October 15, 1954). These storms caused high winds in the vicinity of the tower, and produced howling and eerie noises which terrified some people in the vicinity according to their testimony. This reaction was aggravated by the knowledge that WBS-TV, a television tower in the vicinity of Boston, Massachusetts, failed in the storm "Carol." This was a 640-foot guyed tower which broke off at about the 250-foot elevation. In addition to all this, there probably was present in the minds of people in the neighborhood a fear or suspicion that the tower would not be properly maintained as a result of the cessation of broadcasting operations in December 1953. Added to the psychological factor is the fact, which is admitted by the defendants' expert on tower construction, that the WOR-TV tower is unique as regards its height in the type of environs in which it is set. Having mentioned the tower failure at Boston, it should be noted that there was no proof of the cause of it, whether due to defective design, faulty construction, wind velocity, or some combination of them.
The defendants deny that the tower constitutes a nuisance and they deny any negligence in its maintenance or operation. In addition to this, the defendants urge that the tower was erected pursuant to a permit issued by the Township of North Bergen and in conformity with the *587 requirements of it and the Civil Aeronautical Authority and under a license issued by the Federal Communications Commission. They urge that under these circumstances the maintenance and operation of the tower cannot constitute a public nuisance in the absence of negligence and that such negligence must consist of something more than a mere doing of the authorized act. This is based on the well-known principle that where the doing of a thing that would otherwise be a public nuisance is authorized by legislative authority, the doing of that thing by the person so authorized in the manner authorized cannot constitute a public nuisance in the absence of negligence and such negligence must consist of something more than the mere doing of the authorized act. Many cases are cited in support of this, but it will be sufficient to note Beseman v. Pennsylvania R.R. Co., 50 N.J.L. 235 (Sup. Ct. 1888), affirmed 52 N.J.L. 221 (Err. & App. 1890). These cases all involve public utilities, principally railroad companies.
An examination of Beseman will show the reason for the rule. Chief Justice Beasley, speaking for the Supreme Court, 50 N.J.L., at page 240 said:
"* * * It is a radical error to regard these corporations as simply private. They have a public as well as a private aspect, and it is on this account that the immunity in question belongs to them. * * * It would seem quite irrational to say that the making of the track is an act done so far in behalf of the community that the eminent domain of the state may be resorted to for its furtherance; but that the running of trains upon such track is a purely private affair, in which the people at large have no interest. These roads, in view of their effect upon social and commercial interests, are of vastly more importance than are most of the public highways; and it is on account of this transcendent usefulness that they, to a large extent, have been, and must be regarded as, public agencies. Looking at them in this light, it is but following the ordinary path to declare that they are not responsible for those incidental damages that result from the proper exercise of their functions. This is the settled rule. The legislature may authorize the altering the grade of a city street. Such act may occasion immense loss to the owners of the abutting property, and such loss is damnum absque injuria; the reason being that the improvement is a matter of public concern, and that each individual member of the community, while he is entitled to its benefits, must submit to its *588 burdens. The attitude of a railroad company, so far as relates to the applicability of legal principles, is not dissimilar. They run their trains by legislative authority for the public benefit; and on that account, in doing such acts, they are so far forth the representatives of the body of the people. The defendant alleges that it has kept entirely within the limits of its chartered rights in running its trains, and that the plaintiff has suffered no damage, except such as is necessarily incident to such transactions; and it seems to me that, if this be true, this action cannot be maintained."
While a license was granted by the Federal Communications Commission for broadcasting from the tower, the fact remains that the operation of the tower is entirely private and for commercial profit. It has been held in the federal courts that a radio broadcasting station is not a public utility in the sense in which a railroad is. Pulitzer Pub. Co. v. Federal Communications Commission, 68 App. D.C. 124, 94 F.2d 249 (C.A.D.C. 1937); Federal Communications Commission v. Sanders Bros. Radio Station, 309 U.S. 470, 642, 60 S.Ct. 693, 84 L.Ed. 869, 1037 (1940).
Consequently, notwithstanding that the local authority granted a building permit and that the Federal Communications Commission licensed the broadcasting operation and that the site of the tower and the height thereof were approved by the Civil Aeronautics Authority, the court may at this time consider the question whether or not the operation and maintenance of the tower in itself may constitute a nuisance.
In 66 C.J.S., Nuisances, we find the following definitions:
§ 1. "Although the term `nuisance' has been regarded as incapable of precise definition so as to fit all cases, it has also been held to be a term with a well defined legal meaning, and in legal phraseology applies to that class of wrongs which arise from the unreasonable, unwarrantable, or unlawful use by a person of his own property, real or personal, or from his own improper, indecent, or unlawful personal conduct, working an obstruction or injury to a right of another, or of the public, and producing material annoyance, inconvenience, discomfort, or hurt."
§ 2. "Nuisances are often classified either as public or private or both. A nuisance is common or public where it affects the rights enjoyed by citizens as part of the public; a private nuisance is one that affects a single individual or a determinate number of *589 persons in the enjoyment of some private right not common to the public; and a mixed nuisance is one which is public and which at the same time causes special damage to a private individual."
§ 3. "Nuisances are sometimes classified as per se and per accidens; a nuisance per se or at law is an act, occupation, or structure which is a nuisance at all times and under any circumstances, regardless of location or surroundings, while a nuisance in fact or per accidens is one which becomes a nuisance by reason of circumstances and surroundings."
Confusion is sometimes caused by designating a nuisance as one per se or as one per accidens. Such classification has reference to the proof and not the remedy. In the former the wrong is established by proof of the mere act  here the erection of the tower as the plaintiffs contend  and becomes a nuisance as a matter of law; in the latter by the proof of the act and its consequences. Gainfort v. 229 Raritan Ave. Corp., 127 N.J.L. 409, 412 (Sup. Ct. 1941).
The plaintiffs contend that the tower is a nuisance per se, yet in the course of trial its counsel commented that it might not be a nuisance at all if located in the "meadows" in another part of the township. This is to say that it is a right thing in a wrong place, like a pig in the parlor instead of the barnyard, as was said in Village of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 388, 47 S.Ct. 114, 71 L.Ed. 303 (1926). In the latter contingency the nuisance, if it were such, would be one per accidens.
Much of this is merely a matter of labels; the important consideration is whether the tower is a nuisance at all. It would seem, therefore, that the first question to be determined is whether the tower is in fact structurally inadequate to withstand winds of the velocity reasonably to be expected in the area. In other words, is there a real danger or risk of its toppling under weather conditions reasonably to be anticipated.
The second question is whether in the environment in which the tower is set is it a nuisance because of the probability that ice and snow frozen to its parts may thaw and fall upon people and property in the vicinity.
*590 The third question is whether it has been improperly maintained so as to constitute a nuisance (a) in that warning lights on the tower have not been kept lighted with resulting hazard to aerial navigation, and (b) in allowing fires to occur on the tower with resulting damage or risk of it to property in the vicinity.
The burden of proof is on the plaintiffs. 66 C.J.S., Nuisances, § 127 (c); Benton v. Kernan, 130 N.J. Eq. 193 (E. & A. 1941); Hrycenko v. Board of Adjustment of City of Elizabeth, 27 N.J. Super. 376 (App. Div. 1953).
The proofs with respect to the winds that may be expected in the vicinity and the ability of the tower to withstand hurricane winds come from expert witnesses.
The plaintiffs called a meteorologist, Walter F. Zeltmann, who is chief meteorologist for Weather Photocast, a concern which prepares weather maps for newspapers and other publications. He testified to information as to storms in this vicinity from government records; he furnished certain governmental statistics and expressed his opinion as to what may be expected in the vicinity of the tower in the way of strong winds.
The plaintiffs called also Joshua Muss, a competent graduate engineer who has served as North Bergen's township engineer since 1931. Although he designed some structures for North Bergen, his experience in design and construction is limited. He never designed a tower or structure of the type under consideration.
They also presented as a witness, Harold G. Lorsch, who holds a master's degree from Massachusetts Institute of Technology and a doctor of philosophy degree from Columbia University, both in civil engineering, and who is presently employed as an assistant professor at City College in New York; he is a member of the Committee on Wind Forces of the American Society of Civil Engineers, whose function is to investigate the action of winds on engineering structures. He graduated in 1942 and in the meantime has spent three years in the Army, five years in teaching, and has been otherwise engaged in the engineering field. However, *591 he never built a television or radio transmission tower. He was engaged mostly in bridge and pier work.
The defendants offered William A. Rose, who holds a master's degree in civil engineering. As an assistant and associate professor he taught engineering in New York University from 1938 to 1945. Since then he has been an adjunct professor there and teaches one graduate course each year. He conducts a consulting practice in engineering and another one in engineering and architecture. In his engineering practice he designs towers primarily for the American Telephone & Telegraph Company, and in fact he designed all the towers used by its radio relay system in the United States. He first became acquainted with this tower when the design, plans and specifications conceived and drawn by Lehigh Structural Steel Co. were given to him for his opinion. Through Mr. Muss, he was asked by North Bergen to pass upon the design of the structure and the plans and specifications.
The defendants also called Charles H. Singer, a radio engineer who for more than 30 years has been engaged in the field of radio communications and electronics. His testimony was concerned mostly with the operation and maintenance of the tower rather than its construction.
Zeltmann testified that there were 12 severe storms in this vicinity since 1950, of which six were hurricanes. As to what might be expected in the foreseeable future, he said:
"I would say that in view of the frequency in which we have hurricanes in this area and the possibility of tornadoes, and in view of the fact that we have severe thunder storms, summertime thunder storms, that winds up to 75 miles an hour would occur probably within the foreseeable future at the base of the tower, and that if they were 75 miles an hour at the base of the tower there is a strong probability that they would be close to 100 miles or higher at the level of 1,000 feet above sea level."
It might be mentioned at this point that there was testimony that the top of the tower is approximately 1,000 feet above sea level. He added also that there was a probability that within the foreseeable future there might be gusts as high *592 as 110 miles per hour. He explained that a gust was a substantial and sharp increase in wind for a very short period of time.
He testified with respect to the velocity of the storm "Hazel" which reached this vicinity on October 15, 1954. Information was furnished to the Weather Bureau by WOR of readings on instruments located on the tower itself. It was reported that the winds there had a range of 60 to 80 miles per hour and that at 7:30 P.M., which was at the peak of the storm, the range went from 60 to 86 miles per hour. It was stated that the higher figure represents gusts, whereas the lower figure indicates the average speed in a five-minute period. He testified that the highest velocity in this storm in this area was at the Weather Bureau station at the Battery, New York City, where the fastest five-minute wind speed was 73 miles per hour and the strongest gust was 113 miles per hour.
He discussed also the storm "Carol" which was in this area on August 31, 1954. He said with respect to the readings of it taken at the Weather Bureau station at the Battery where the instruments are located at a height of about 450 feet above sea level, that the "maximum velocity was, the average five-minute speed, the maximum average five-minute speed was 48 miles an hour from the northwest. But the fastest mile was 61 from the northwest. That would indicate that it was within several miles of the point where hurricane-force winds existed."
This witness discussed the wide area covered by hurricane winds and the great variation in the speed of the same from the eye of the storm to the fringes of it. When asked whether winds might exceed 120 miles in this vicinity, he said: "I say there is a definite probability in intense hurricanes at their most mature stage. It would get over 120 miles an hour."
The witness testified at length and was not consistent in his estimates of what might be expected. Against this it is interesting to note the data reported in the bulletins issued by the Weather Bureau of the U.S. Department of Commerce *593 and received in evidence. One is entitled "Local Climatological Data with Comparative Data, 1954, New York, New York." This shows the following readings as to each month under the heading "Wind  Fastest Mile" for the year 1954:

 WIND
 Fastest Mile
 Speed Direction Date
 51 NW Jan. 1
 57 NW Feb. 12
 65 SE Mar. 1
 49 NW April 3
 46 NW May 22
 51 NW June 27
 73 NW July 14
 61 NW Aug. 31
 61 NW Sept. 11
 113 SE Oct. 15
 59 W Nov. 29
 49 S Dec. 18

And in the compilation of normals, means, and extremes over the period of 1891 to 1954, the following data is reported:

 WIND
 Mean hourly Prevailing Fastest Mile
 speed Direction Speed Direction Month Year
 16.5 NW 76 SW Jan. 1913
 17.0 NW 91 SW Feb. 1912
 17.3 NW 91 SW Mar. 1913
 15.9 NW 95 NW Apr. 1912
 13.6 NW 74 W May 1945
 12.9 S 94 W June 1952
 12.1 S 95 NW July 1914
 11.7 S 74 NW Aug. 1944
 12.5 N 99 N Sept. 1944
 14.0 NW 113 SE Oct. 1954
 15.8 NW 87 W Nov. 1934
 16.3 NW 91 NW Dec. 1934

From this table it is seen that in a period of 64 years there was a wind velocity in excess of 100 miles per hour only *594 once and that was a gust, and above 90 miles only seven times.
The tower is designed to withstand a wind load of 30 pounds per square foot. The experts on both sides agree that if the tower were to fail, it would be at the foundation. Their opinions differ, however, as to the wind velocities which the tower may be reasonably expected to withstand.
Lorsch testified that the tower should have been designed for a higher wind load than 30 pounds. He gave it as his opinion that the tower would topple in a wind with a velocity of 120 miles per hour, though it might possibly withstand a higher one. He admitted that he knew of no reported failure of an unguyed tower, whereas he was aware of the fact that there have been failures of guyed towers to the extent of five per cent. The latter are designed differently and they react unfavorably at times when uneven strains are exerted at different levels.
Muss testified that aside from the wind pressure factor, the tower with proper painting should stand indefinitely. He said that there was a probability of failure in winds which could be expected in this area. He said that studies and surveys subsequent to its erection indicate that a tower of its type should be designed to carry a greater wind load than 30 pounds per square foot, mainly because in recent years there has been an increase in winds of hurricane force in this area. He, too, admitted that he knew of no failure of a self-supporting tower; that the only known failures of which he was aware were of guyed towers.
Rose testified that the tower conforms with safety standards which were generally recognized at the time of its construction and that it conforms with current standards. He said that the tower is reasonably designed in view of present knowledge in the field of tower construction. He stated that no structure is designed and built to withstand every conceivable wind. In this connection one of plaintiffs' witnesses testified that as far as he knew the only structures in existence that might stand up to a tornado are the pyramids of Egypt. Rose gave it as his opinion that the *595 tower can reasonably be expected to withstand winds in excess of 130 miles per hour. He stated that in his opinion "a 30-pound tower properly designed will withstand anything that is going to happen in this area or any area except certain parts of the United States, in the southeastern part."
The response which Rose gave to the following question is impressive:
"Q. In your opinion, what strength wind, what type of wind would be the maximum that the WOR TV tower could be reasonably expected to withstand? A. I would assume there would be a gradation of wind from the top to the bottom. The top wind would have to be something in excess of 130 miles an hour. And then we could not say positively that the tower would fail. The only thing we could say positively would be that we could not say that it would not fail."
Rose testified that he designed for the American Telephone & Telegraph Company more than 500 self-supporting towers up and down and across the country, varying in height from seven feet in the State of Utah to 415 feet at Des Moines, Iowa, and that not a single one has failed. The average height of these towers he stated to be about 225 feet. It may be observed parenthetically that all the experts agreed that the height of a self-supporting tower is not in itself important if it is properly designed. As stated above, the plaintiffs' engineers have had no experience in designing self-supporting towers.
A very important fact in this case is that the tower has now been standing almost seven years and there is no suggestion of any structural or maintenance deficiency. The only thing urged against it is that it should have been designed to withstand a greater wind load.
The wind experience in this area shown in the tables above is based on fact and is far more persuasive than the opinion or conjecture of Zeltmann. Moreover weather forecasters are regarded as fallible.
In evaluating the opinions of the engineering experts, the very extensive practical experience of Rose in the designing *596 of towers makes his testimony more persuasive and convincing.
Plaintiffs have the burden of proof and it is my conclusion that they have failed to show that the tower is structurally inadequate to withstand winds of the velocity reasonably to be expected in this area. On the contrary, it seems to be affirmatively established by the defendants that if properly maintained it will withstand indefinitely any winds reasonably to be anticipated.
With respect to the claim that ice and snow are deflected from the tower, it appears from the evidence that the tower in fact is not so constructed that ice or snow would normally be deflected and caused to fall from it beyond the property lines of the defendants and on to the abutting streets or the lands of adjoining owners. If it were so constructed, then such deflection would be actionable. Cf. Brownsey v. General Printing Ink Corp., 118 N.J.L. 505 (Sup. Ct. 1937). From all the proofs, including the testimony of many persons residing in the immediate vicinity of the tower, it would seem that the occasions on which melting ice or snow from the tower was caused to fall outside the defendants' property lines were negligible, and the damage resulting therefrom was likewise negligible, except on March 15, 1950. On that day, a considerable amount of ice fell from the tower and was carried by the wind a distance of several hundred feet to the north and east of the defendants' property. The police found it necessary to close off streets for a distance of two blocks in several directions. The occurrence at that time was somewhat phenomenal due to a combination of circumstances. First, there was a quick freezing in misty weather at the upper part of the tower, followed by a rapid thawing at a time when a high wind was blowing. Singer, the radio and electronics engineer, testified that he observed the conditions on that day and the freezing on the tower was above the 600-foot level. He testified that he, over a period of years, made a study of the formation of ice on towers and antennas; that he participated in surveys and research projects with *597 respect to the problem in general and this tower in particular, but that neither he nor any of the scientists or research laboratories with which he worked could evolve any practical remedy which would prevent the formation of ice on a transmission tower, particularly on the antenna. He testified that the experience of March 15, 1950 was the only one where there was any precipitation of ice beyond the confines of the property except in a negligible way. He said also that on that day there were ice problems at the Chrysler and Empire State buildings in New York City which required the closing off of streets in the vicinity of them.
Township Engineer Muss testified that the only day when he made any observations of ice conditions on the tower was on March 15, 1950. He made his observation from a distance of several hundred feet and he observed no ice below the 250-foot level.
The happening on that day was most unusual and there has not only been nothing similar to it since, but nothing at all of a serious nature. That it must have been regarded by the plaintiffs and the persons living in the vicinity of the tower as an extraordinary occurrence may be inferred from the fact that no action was taken with respect to it and that almost five years elapsed before this present action was brought. Further, there has been no showing that the falling of ice or snow from the tower beyond its property lines was caused in any way by the negligence of the defendants.
Clearly the plaintiffs have not established that the tower constitutes a nuisance by reason of the precipitation of snow and ice from it.
The proofs show that the tower is equipped with a system of warning lights that has met with the approval of the Civil Aviation Authority. In the tower there is a system that automatically records an extinguished light; in addition, the said Authority maintains a service at Newark Airport whereby it warns all aircraft in the vicinity in the event that required lights become extinguished on any *598 structure. This tower is merely one of many structures in the line of aerial flight which carry warning lights.
As to the contention that there have been fires in the tower which constitute a hazard to the neighborhood, it appears that there were two fires. On July 22, 1949, while the tower was being painted, carelessness of a painter smoking a cigarette caused a fire to tarpaulins which were spread out at the 600-foot level. These were cast from the tower by the painters and some of them fell on adjoining buildings doing some damage to roofs. This was an accident that could happen any place during any painting operation; and it not only has never occurred again, but in the nature of things is not apt to. There was another fire on October 11, 1950 in the control house which is built in the tower about 550 feet above the ground. This house is entirely fireproof and the fire was confined within it. The recitation of these facts makes it obvious that the tower does not constitute a nuisance because of the probability of fires which may cause damage to surrounding property.
The plaintiffs have failed to establish that the maintenance of the tower constitutes a nuisance. In the light of the above conclusions, it is not necessary to consider other defenses urged by the defendants.
Judgment may be entered for the defendants.